## Schauer Dismissal Case.

Argued October 6, 1960. Before JONES, C. J., MUS-MANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Loyal H. Gregg,* with him *Gregg and Price,* for appellant.

*Thomas P. Shearer,* with him *Peter F. Flaherty,* for appellee.

Opinion by Mr. Justice Musmanno, November 15, 1960:

This is an appeal by Whitehall Borough from a decision of the County Court of Allegheny County reversing the action of the Civil Service Commission of Whitehall dismissing Willard Schauer as chief of police of the town. The dismissal of the head of a police department anywhere is a drastic procedure which requires strong evidence of misbehavior to support it. Nothing could more weaken faith in the orderly processes of government than loose tampering with the position of officers pledged to uphold law and order. On the other hand, of course, if a police officer has been proved untrue to his trust, his withdrawal from office is as necessary as the surgical removal of malignancy. The record in this case fails to show anything remotely requiring surgery in the Whitehall Police Department.

Willard Schauer became Chief of Police of Whitehall on November 1, 1953 as the result of a civil service test. He was well qualified for the position, having for 17 years been a member of the Pennsylvania State Police, in which superbly efficient organization he attained the rank of sergeant. He left the Pennsylvania State Police with an honorable and blemishless record behind him. He did equally well with the Whitehall Police Department. For five years his incumbency in Whitehall was regarded with such favor that in the nature of a reward and to further develop him in his chosen work, the Borough in the spring of 1958 sent him to the F.B.I. School in Washington for a three month special course.

During his absence some dissatisfaction sprouted in the police department over the manner in which traffic tags were being handled. When he returned, he made an investigation and after some watchful

waiting, came to the conclusion that one of the justices of the peace of the town was endeavoring, through the use of gratuities to police officers, to stimulate a more liberal use of traffic tags in order to enhance his returns on the ensuing court costs. Schauer spoke to the Burgess about his apprehensions in this respect. The Burgess did not seem to regard the matter too seriously and later ordered that all tags should be turned over to him.

On April 1, 1959, the chief of police, in accordance with the oral request of several members of the nine-man council, presented at a public hearing of the council a written report on the police business of the town. The report made reference to the unrest in the department; it spoke of Schauer's conversations with the Burgess; of differences he had had with the Burgess and much was said about the traffic tag situation.

The Burgess and some members of the council regarded this report as an attack on the Burgess and police, especially in view of the fact that the report was given attention in the press and over radio and television. As a consequence the council ordered and conducted an investigation into the matters reported by Schauer; and then, on May 19, 1960, by a vote of 4 to 3, ordered his dismissal, charging and convicting him of dereliction in duty, conduct unbecoming an officer and insubordination.

Schauer appealed to the civil service commission which heard testimony and eventually exonerated him of the charge of dereliction in duty, but affirmed the counts of insubordination and conduct unbecoming an officer, thus sustaining the dismissal. Schauer appealed to the county court which reviewed the testimony taken before the council and the civil service commission and heard additional testimony. It concluded, as already stated, that Schauer had been improperly dismissed and ordered his reinstatement.

There is no doubt that the county court had jurisdiction in the case. (§§1184-1185, The Borough Code, 1947, P. L. 1621, 53 PS 46184-85; *Lower Merion Township v. Turkelson,* 396 Pa. 374.)

We are called upon to determine whether the court below was guilty of abuse of discretion or committed error of law in its decision. (*Vandergrift Borough v. Polito,* 397 Pa. 538.)

Whitehall, which came into being as recently as 1948, by detachment from Baldwin Township, is a pleasant little borough of 17,000 inhabitants, with a police force of 14 men. Small towns often play big politics. Nor is there anything wrong about this. A lively and competitive interest in governmental affairs may well encourage progress because, with separate groups, factions or even individuals vieing for the approbation of a larger segment of the population, the community may gain in improved services. However, it happens occasionally that the rival groups become more interested in berating and degrading the opposition than in improving the town and then political maneuvering may not necessarily stand for progress.

The vote of council against Schauer was 4 to 3, which would suggest that his faults in office, whatever they may have been, if any, had not aroused unanimous disapproval. Of course, a vote of 4 to 3 would suffice for dismissal (because our government is based on majority rule) if the charges against the accused appealed to the reasonable mind as being based on substance. The record does not manifest such substance.

The borough appellant argues that Schauer's dismissal should be upheld because he was not more vigorous in the prosecution of traffic violators. It says that there was a personal motive behind this alleged laxity. For a short period of time, because of a va-

cancy in the office of borough manager, Schauer discharged the duties of borough manager as well as those of chief of police. The borough maintains that Schauer was ambitious to obtain permanently the position of borough manager and that one of the most formidable of his rivals for this appointment was Squire Brunn.

Schauer did not get the appointment (nor did Brunn), but, according to the appellant, Schauer became vindictive against Brunn and sought to harm him financially by not arresting traffic violators so that Squire Brunn would have less cases and thus less costs to collect.

If this charge could be proved, it would constitute unquestionably the most conclusive evidence imaginable of unfitness for office because nothing can be more wicked than the use of a public trust for personal revenge by exercising excessive rigor or excessive leniency in the prosecution of the law. There is nothing in the record, however, which could possibly substantiate so grave and, in the light of the evidence, so grotesque a charge. The decline in the issuance of traffic tags during the period in question is explained by several facts: (1) Schauer was using many of his police in patrolling residential areas where aggressive prowling had been reported; (2) on several occasions he assigned some of his police to adjoining boroughs to help in establishing road blocks for apprehending escaping criminals; (3) Schauer's double job as acting borough manager and chief of police removed him from the streets where he might more actively supervise traffic and catch traffic violators; (4) severe weather kept auto traffic at a minimum.

Even the civil service commission found that Schauer could not be held responsible for the languishment of traffic tags during December, 1958 and January, 1959 and found him innocent of the charge of dereliction in duty.

The borough argues that Schauer was guilty of insubordination because he made a written report to council when he had been ordered by the Burgess not to make such a report. The record shows, as heretofore stated, that several members of the council had asked for this report, and then, only nine days after the report was made, the council unanimously ordered him to continue making written reports. It is inconsistent, to say the least, for council to condemn a chief of police for a procedure they themselves found to be so helpful and desirable that they, without a dissenting vote, ordered it to be permanently continued.

Another charge of insubordination was that Schauer did not obey the Burgess's instruction to turn all traffic tags over to him. Schauer explained: "I cautioned them [the police] about making arrests properly, filing their information properly, and following their cases right through to conclusion, because at that time I was worried about twenty-five cases that had been taken away from Squire Zord and turned over to another squire after they had been properly filed, in my opinion, before the squire. If that had gotten out publicly or an attorney had gotten hold of that information, every one of those cases, in my opinion as a policeman, a discharge would be in order. As a result of that move, I was somewhat concerned and worried that I as chief of police would be right in the middle of that because in instructing a policeman, a superior officer can give you an order. You can go out and carry it out and if you get in trouble the superior will not be the one to answer. You yourself will be the one to answer, not your superior."

If Schauer erred in this, he was punished for it because, after he had made his report on April 1st, the Burgess ordered him temporarily to the tasks of a patrolman at night. At any rate, whatever may have

been Schauer's attitude in his differences with the Burgess, it cannot be said that he was disrespectful of authority and, in no case, can it be said that his conduct merited dismissal after 22 years of unblemished police work.

An oblique way to discredit a person is to proclaim that there is no proof of an iniquitous condition with which he is unfactually charged with having portrayed. Thus, the borough council made a "finding of fact" that: "no evidence whatsoever was produced at the hearing to indicate any irregularities or misconduct on the part of any of the police officers of the Whitehall Police Department." Schauer never accused the police of irregularities. On the contrary, he stood by their side seeking to protect them from unwarranted interference. It may be said to the credit of Schauer and the police under him that Whitehall enjoys one of the lowest crime records in Western Pennsylvania.

Throughout the many hearings in this case, no evidence was produced which would in any way impugn Schauer's personal character. Judge GUFFEY, in his excellent opinion reversing the civil service commission, said: "Two members of the minority faction [those who voted for Schauer] came into court voluntarily and testified in his [Schauer's] favor because they believed that the action of the majority was unfair. Both of them had been hostile to the chief of police in the past, but felt he was wronged in this instance."

Even the civil service commission said in its decision that: "The appellant makes repeated references to the fact of Mr. Schauer's exemplary behavior as chief of police prior to the happenings which brought about the present hearing. There is much testimony in support of Mr. Schauer's capabilities as a police officer, and from its frequent dealings with him in connection

with civil service matters, this commission also had high regard for his abilities."

No purpose would be served in extending this discussion. We are satisfied that the lower court did not abuse its discretion nor did it commit any error of law in reaching its decision. While we would not say that the strife in Whitehall has been a tempest boiling in a political teapot, it does appear that the storm of controversy came about as the result of quick tempers and some faulty judgment on the part of nearly everyone concerned, including the chief of police. Even the civil service commission, although it affirmed the action of the borough council in two particulars, pointed out that the council was not without some fault: "This commission would be remiss if it did not set forth its firm belief that council is not entirely free of blame or responsibility for the happenings which have led to their action in dismissing Mr. Schauer. There is little question in our minds that the employment of Mr. Schauer as acting borough manager (even though eagerly sought by him) was decidedly ill-advised and contributed to the unfortunate happenings with which we are dealing herein."

Fortunately the tempest has subsided and there is no reason why all parties concerned may not now resume the even tenor of their ways, bringing reciprocal understanding and tranquillity to the pleasant and admirable little Borough of Whitehall.

Order affirmed.

Mr. Justice BOK concurs in the result.

Mr. Justice BENJAMIN R. JONES dissents.