## Pickles v. City of Harrisburg

*P. Richard Wagner,* for plaintiff.
*Nathan H. Waters,* for defendant.

MORGAN, *J.,* May 9, 1984—On June 24, 1982, the City Council of Harrisburg, after hearing on

charges in connection with the shooting death of a suspected felon, Leon Marks, dismissed police officer Richard L. Pickles and we are here considering his appeal from that action.[1]

According to the cases, the de novo review provided for in these appeals by the Third Class City Code (53 P.S. §39408) does not mean what it seems to say; that is, that we hear the case "anew, afresh", a complete retrial upon new evidence, nor even a trial upon the record before the lower tribunal. We may not substitute our discretion for that of city council if the evidence produced at the hearing supports the discretion exercised by council. On the other hand, there must be substantial evidence and not merely suspicious circumstances to warrant the disciplinary action here questioned. "An officer should not be dismissed from service unless it is for just cause, not only charged but proven by substantial evidence. Ditka Appeal, 385 Pa. 435, 123 A.2d 718 (1956),[2] affirming an order of the Berks County

---

1. The appeal was filed on July 14, 1983, but the transcript of the hearing before city council, consisting of some 1600 pages of testimony, less one entire volume and all of the exhibits, was not filed until December 22, 1983. The full record was not delivered to the court until March 6, 1984.

At a hearing held on October 22, 1983, testimony was presented on the issue of compliance with the Sunshine Act and other matters. After having an opportunity to examine the transcribed proceedings before council, we conclude that we should not and we have not considered any of the other testimony presented, deciding that our review is on the record certified to us by council.

2. Consider dissenting opinion of McBride, J. in Bell Appeal, 396 Pa. 592, 152 A.2d 731 (1959), that "At most the Ditka case is not authority for the proposition that the court does not come to its own conclusion but only goes so far as to say that in doing so it may consider the finding of the administrative tribunal as being of some persuasive weight. (p. 644).

Court of Common Pleas on President Judge Warren K. Hess's opinion reported at 5 D. & C.2d 569 (1955).

The foregoing principles are of a piece with the general proposition that we may not declare that an agency has abused its discretion and set aside its action unless the agency's discretion has been exercised arbitrarily or unreasonably, the law overridden or misapplied, or the judgment of the agency is manifestly inappropriate. Edwards v. St. Bd. of Funeral Directors, 34 Pa. Commw. 249, 383 A.2d 564 (1978).

We do not hesitate to announce that in this case city council abused its discretion and that its order must be set aside.

The following evidence in the case was uncontradicted:

On December 4, 1982 at about 1:45 a.m., Officer John T. Spicer of the Harrisburg City Police, in uniform and driving a marked car, observed an automobile, which had been reported stolen, stopped at a traffic signal at Third and Reilly Streets with no headlights on. Spicer followed the automobile to Williams Street where he activated his emergency lights, got out of his police car and approached the operator's side of the suspect vehicle which had stopped along the curb. As Spicer approached the vehicle he was observed by the operator who thereupon drove away. Spicer followed and at Atlas Street, where the car again stopped, he once more exited the police car and approached the driver. Again, when the driver observed Spicer approaching, he put the car in gear and fled. Spicer pursued the vehicle which was travelling through controlled intersections at speeds up to 80 miles per hour, still with its headlights out, to Seneca Street, a one-way street which the fleeing operator entered against

the traffic, forcing another vehicle out of the lane of travel. During the chase, Spicer had radioed that the suspect vehicle was reported stolen and had fled from him after being stopped. At Seneca Street, Spicer broke off direct pursuit which was taken up by other officers, including Richard W. Pickles and Richard S. Mowery, II, who heard Spicer's radio message. Officers Pickles and Mowery were in unmarked cars, Officer Darnell Bowman, also closing in was in a marked car with his bar light flashing.

The chase continued down Front Street where the suspect vehicle went through red lights at Maclay Street and at Forster Street, at speeds up to 85 miles per hour, and with lights still off. At Front and State Streets, the suspect vehicle came to a stop with Mowery's vehicle angled toward it at the front to cut him off and Pickles' car to the rear. Mowery then got out of his car and ran up to left front headlight area of the suspect vehicle, shouting "City Police, you're under arrest, put your hands up". The suspect, ignoring the command, tried to start his car and Mowery fearing that he might be run down moved off toward the curb. At that point he observed Pickles come up to the operator's window, which was open and shout twice to the man that he was police "and to get his hands up." The suspect was still trying to start the car and Mowery saw Pickles reaching inside with a batting motion, in what Mowery believed was an effort to stop the victim from starting the car. As Mowery moved again toward the car, he saw Pickles move, arching his back away from the driver, then a gun flash.

Pickles, who was working in plain clothes in the burglary and robbery detail, heard Spicer's radio that he was stopping, then approaching a stolen automobile and then that he was in a chase and

went to give assistance. He saw the suspect vehicle at a high rate of speed going the wrong way on Seneca Street. At Front Street he joined the chase with Mowery and witnessed the suspect vehicle run the traffic light at Maclay Street and Forster Street. Pickles stopped behind the suspect vehicle at State Street, opened his door and with one foot out of the car and the other on the brake shouted that he was a police officer and the other man should put his hands up. Pickles heard the driver trying to start the car, and seeing Mowery approaching the front of the vehicle, moved out from behind his own car door toward the suspect vehicle to back up Mowery. As he reached the open window, holding his service revolver at his side, he shouted twice again for the driver to put his hands up. The individual ignored the commands and Pickles reached in and pulled the operator's hand off the ignition. Whereupon, the driver reached down with both hands and turned toward Pickles with what Pickles believed to be an automatic weapon, a mini-machine gun. Pickles tried to block the object, but the man kept bringing it up and, yelling to Mowery that the man had a gun, Pickles fired his own weapon, striking the individual, later identified as Leon Marks, in the head, killing him.

Another officer, Deppen, arrived at the scene moments thereafter and upon opening the door to the suspect vehicle found that what Pickles believed to be a weapon was an automobile rear-view mirror. The mirror, which Deppen did not recognize as such until he looked closely at it from a few inches distant, was between the victim's legs, clutched in his both hands with only the dark side and handle or grip visible.

## I. THE PROCEDURE

It has been said that procedural fairness and regularity are of the indispensable essence of liberty.

Dealing as it did with the termination of Pickles' employment, the decision of city council was adjudicatory in character. It follows that an adjudicatory action cannot validly be taken by any tribunal except upon a hearing wherein each party has opportunity to know of the claims of his opponent, to hear the evidence introduced against him, to cross-examine witnesses, to introduce evidence on his own behalf and to make argument. Callahan v. P.S.P., 494 Pa. 461, 431 A.2d 946 (1981). The procedure followed in this case was palpably deficient and violative of due process.

### A.

It is axiomatic that due process requires that an accused be informed with reasonable certainty of the nature of the accusation against him. For notice to be adequate, it must at the very least contain a sufficient listing and explanation of any charges against the accused so that he can know against what charges he must defend himself if he can. Begis v. Ind. Bd. of the Dept. of Labor and Ind., 9 Pa. Commw. 558, 308 A.2d 643 (1973). The charges directed to Pickles by letter dated March 17, 1983 from the president of city council are general and imprecise. They read as follows:

"You are being charged with the following violations of the Disciplinary Code of the Harrisburg Police Bureau . . . :

ARTICLE I — Conduct Unbecoming an Officer Section 1.12 — Repeated violations of departmental rules and regulations or other course of conduct indicating that a member has little or no regard for

his/her responsibility as a member of the Bureau of Police.

ARTICLE IV — Neglect of Duty Section 4.05 — Failure to comply with any Police Chief 's or Director of Public Safety Orders, Directives, Regulations, etc., or any oral or written orders of superiors.

ARTICLE V — Disobedience of Orders
Section 5.09 — Improper use, handling or display of firearms."

A suspension or removal notice must be framed in a manner which enables the employee to discern the nature of the charges and to adequately prepare his defense. The employee must be informed with reasonable certainty of the charges against him. We agree that the charges need not be drawn with the certainty of a bill of indictment or information, but the most cursory look at the foregoing charges reveal their shortcomings. What specific rules and regulations are referred to? What conduct? What directives? When and where and how did the violations or lack of compliance take place. Which was it, the use, handling or display of a firearm that the accused did improperly and how or why was it improper? Morrone v. Commonwealth Board of Probation and Parole, 72 Pa. Commw. 433, 456 A.2d 1143, 1144 (1983).

The young officer here was facing dismissal, not some minor and summary form of discipline. Prompt objection was made by his counsel and the response from the city solicitor was simply that "This is the way that we have handled these cases in the past," adding that advice as to the charges was previously given to the accused in proceedings before the Firearms Review Board and the Disciplinary Board. The argument is as devoid of reason as a suggestion that a criminal information need only recite a code section because the complaint

filed with the district justice sets forth greater detail. The point that the solicitor ignores is that this accused was entitled to know what charges city council would be weighing, not some prior board. The inadequacy of the charges is plainly revealed by the confusion among the prosecutors as to what the charges were. For example: For the first time in any proceeding, the solicitor elicits from the Chief of Police Vajda that one of the charges against Pickles is an alleged violation of Directive 15 relating to the safe operation of police vehicles. Upon objection by counsel, the solicitor withdraws this charge but, of course, by this time council has heard the opinion of the chief that it was violated, an opinion not shared by anyone else.

Another example: Chief Vajda, who requested the solicitor to schedule a hearing before city council on the broad charges heretofore stated, testified that the charge of violating Article IV included a consideration by council whether the accused violated the directive which provides that:

"A police officer is justified in using deadly force when he or she believes that such force is necessary to prevent death or serious bodily injury to himself or another person."

Dean, the Public Safety Director who directed Vajda to request the hearing testified that the consideration was not the foregoing but rather whether the accused had violated the directive relating to the use of force against a fleeing felon. In its adjudication city counsel concluded that the issue was not as Dean contended but rather as Vajda had put it. And at the hearing before us, the city solicitor was obviously confused because it was stated that the issue was not whether Pickles should have used deadly force and his reasonable belief of self defense but

whether he wrongly put himself in a position where force was necessary.

Another example: Vajda told council that the charge of conduct unbecoming an officer related to both repeated violations of rules and regulations and a course of conduct. Dean, however, testified that the issue before council did not include a charge of repeated violations.

In the face of such disagreement, how can it reasonably be argued, that the accused should know what direction the prosecution of charges would take.

## B.

The disregard for the rights of the accused in the presentation of evidence was shocking. We recognize, of course, the familiar principle, repeated in the Local Agency Law (Act of April 28, 1978, P.L. 202; Tit. 2 App. 2 Pa.C.S. §554) that the rules of evidence prevailing in courts of law shall not be controlling. Phillips Aplt. v. Unemployment Comp. Bd., 152 Pa. Super. 75, 30 A.2d 718 (1943). This is not authority, however, for denying parties in an adversary proceeding fundamental rights enhanced by certain rules of evidence. Among such fundamental rights is that of confronting, cross-examining and refuting witnesses. City of Pgh. v. Workmen's C. A. Bd. and Sherred, 12 Pa. Commw. 246, 315 A.2d 901 (1974). It must appear that the order is based on findings of fact supported by competent and relevant testimony. Phillips, supra.

The appalling disregard for evidentiary propriety was demonstrated at the outset of the trial when the city solicitor presented each member of council with a portfolio of "documents which will be placed in evidence in this matter." The record is not clear

what exact materials were thus given over to inspection by council prior to their admission into evidence.

"Ms. Perkins: I have a whole folder of information here that has not been submitted as evidence that I don't know why I have it, but it's here for me to look at."

It is reasonable to infer, however, since the record does not reveal a ruling on all requests for admissions, that the folder contained materials never admitted or, as we will demonstrate, improperly admitted, and the unfairness to the accused is obvious.

Significantly, documents were admitted into evidence that were grossly improper. For example, a report of a Firearms Board, comprised of three police officers and convened to investigate the circumstances surrounding the discharge of the weapon by Officer Pickles, was admitted into evidence. Parts of it were read to council over strenuous objection (I-51). The report contained conclusions as to facts derived from an internal investigation file never placed in evidence in the hearing before council and from unrecorded testimony of unidentified witnesses. The authors of the report were not subject to cross-examination by Officer Pickles. See Kreiger v. Bd. of Pensions and Ret., 47 Pa. Commw. 131, 408 A.2d 170 (1979). Further, the report set forth opinions of the members of the board based on these conclusions which related to the very issues before council for determination; namely, whether Officer Pickles had violated certain provisions of the Disciplinary Code.

We are familiar with the principle that the local agency is not bound by the technical rules of evidence and we would not rule that all hearsay evidence is inadmissible. The question is whether it is

hearsay of the sort upon which reasonable persons are accustomed to rely and we must conclude that it is not. We have no idea what the evidence was before the Firearms Board. Especially prejudicial are the opinions of the board members. It is axiomatic that if a fact finder does not know the facts upon which an expert bases his opinion, the opinion is inadmissible. Com. v. Paskings, 447 Pa. 350, 290 A.2d 82 (1972). Whether salient facts relied upon are fully disclosed in the report cannot be determined without an opportunity for cross-examination. In this case, as discussed earlier, it is entirely unclear whether the Firearms Board was, in fact, examining the same rules of conduct as city council. Written reports of studies of investigators concerning causes and effects, containing opinions and conclusions should not be admitted into evidence unless the investigators who prepared them are present for cross-examination, A.P. Weaver & Sons v. San. Water Board, 3 Pa. Commw. 499, 284 A.2d 515 (1971). Such a report would not be made competent even had Pickles been given the right to cross-examine the members of the board; he must also have been able to examine those who gave statements. Cross-examining the investigator on subject matters wholly hearsay would be futile. The report had no probative force. Phillips, Ap. v. Unemployment Comp. Board, 152 Pa. Super. 75, 30 A.2d 718 (1943).

Another example of evidentiary unfairness, was the admission into evidence (CX22) of a written statement of Alfred W. Dean, Public Safety Director who initiated the charges against Officer Pickles, directed to the Chairman of the Police Disciplinary Board which had substantially exonerated the officer, explaining his objections to the findings of that

board and how he believed Pickles had been guilty of misconduct requiring dismissal.

Dean had appeared as a witness, examined and cross-examined, and CX22 was the most blatant of self-serving declarations, providing the council with a written statement of only part of his testimony and that the most argumentative and opinionated. In this connection it is significant that council elected to render its decision in this matter without a transcribed record of the proceedings which would have included all of Dean's testimony. In addition, of course, to the point already made, Dean's statement was inadmissible for the reasons we are about to discuss that his oral testimony was improper.

The most egregious abandonment of evidentiary fair-play was revealed in the testimony of Alfred W. Dean, Public Safety Director, who alone testified directly in support of dismissal of the Officer Pickles on the charges.

There had been admitted into evidence a report of the Disciplinary Board to Dean dated February 7, 1983 setting forth its findings on charges framed in precisely the same language as set forth in the notice to Officer Pickles from city council. This board had concluded that on the evidence presented to it that Officer Pickles' only misconduct was that in advancing on the victim's stopped vehicle instead of waiting for additional officers to arrive on the scene to assist with the apprehension he had failed to comply with Public Directive no. 5 and had thus violated Article IV, Section 4.05, (failure to comply) recommending a three day suspension. The Disciplinary Board exonerated Officer Pickles on the charge of violating Article V, section 5.09 (Improper use, handling or display of firearms) and on the charge of Article I, section 1.12 (Repeated violations of departmental rules and regulations, and/or any

other course of conduct indicating that a member has little or no regard for his/her responsibility as a member of the Police Bureau).

The Report of the Disciplinary Board was, like the Disciplinary Board Information Report (CX5), otherwise irrelevant and inadmissibile in these proceedings and it seems likely that it was offered into evidence by the city solicitor only as a necessary part of Dean's response to this prior administrative result of which council was certainly not unaware.

Admittedly Dean had participated in none of the prior proceedings and was not present to hear any witnesses. Still he was permitted to analyze and evaluate each of the Disciplinary' Board's findings on the basis not only of the facts set forth in that report but on other reports of investigations submitted to him including a Firearms Review Board Report (CX7) which was improperly admitted into evidence and a Police Internal Affairs Unit Report which was never offered.

His testimony was to the effect that although he agreed with the finding of the Disciplinary Board that Pickles had violated Public Safety Directive no. 5, in failing to remain in his vehicle until back-up arrived, (Dean increased the suspension for this violation from three days to five days), he disagreed with their other findings, arguing that the board had incorrectily considered the abuse of firearms charge (Article V, Section 5.09) as an alleged violation of Section B of Public Safety Directive no. 5 which provides: "A police officer is justified in using deadly force when he/she believes that such force is necessary to prevent death or serious injury to himself or to another person," instead of under Section C relating the use of deadly force in the apprehension of a fleeing felon. According to Dean, Pickles had used excessive force to apprehend a fleeing fel-

on and was guilty of this charge. Further, he complained that the Disciplinary Board had incorrectly considered the charge of Neglect of Duty (Article I, Section 1.12) as an alleged violation of the first clause of the section which reads, "Repeated violations of departmental rules and regulations . . .", from which it had exonerated Pickles instead of the second clause which reads ". . . or other course of conduct indicating that a member has little or no regard for his/her responsibility as a member of the Bureau of Police."

Dean's testimony confirms the inadequate notice to Officer Pickles of the charges against him. Here, the Public Safety Director contends that three of his officers, including a Captain and a Lieutenant, did not understand the nature of the charges and, yet, in a hearing in which a police officer's dismissal is demanded, no greater specificity is provided.

As one reads Dean's testimony it is plain that his appearance was not as a witness, but as an advocate. Moreover, the written statement was included in the evidence. He was allowed to interpret the language of regulations with familiar ordinary meanings and also, indeed, to provide a meaning of a statement made by the Disciplinary Board. He had no first-hand knowledge of any material facts. His confusion about the significant fact of where Pickles' fellow officer, Mowery, had positioned himself as Pickles advanced on the stopped vehicle, was noted by a council member. If we assume that he appeared as an expert, the question raised goes more than just to the weight of his testimony, but whether it should have been admitted. According to Dean, he reached his conclusions from information contained in reports prepared by others, the authors of which, much less the witnesses who were interviewed, were not subject to cross-examination. It

has been said that the hearsay rule is not a technical rule of evidence but a fundamental rule of law which ought to be followed by administrative agencies at those points in their hearings when facts crucial to the issue are sought to be placed upon the record and objection is made thereto. Bd. Met. Ed. & Lec. v. Contakos, 21 Pa. Commw. 422, 346 A.2d 850 (1975). Counsel for Officer Pickles strenuously objected to Dean's testimony. An examination of Dean's testimony discloses that the following statement from Collins v. Hand, 431 Pa. 378, 246 A.2d 398 (1968), citing Dreher v. Order of United Commercial Traders of America, 173 Wis. 173, 180 N.W. 815, 817 (1921), is especially apt: "It is the function of opinion evidence to assist the fact finder in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed. . . . The basis for the conclusion cannot be deduced or inferred from the conclusion itself. In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion." Dean's testimony was improperly admitted and in the light of his vigorously asserted expertise, his role as the protagonist for the punitive measures sought and awarded by council, the prejudice was inherent.

## C.

In weighing the fairness and regularity of this proceeding, we must also acknowledge a concern that the city solicitor prosecuted the charges. A "fair trial in a fair tribunal is a basic requirement of due process," In re Murchison, 349 U.S. 133, 136 (1954) and this requirement is as applicable to administrative agencies as it is to the courts. No member of city council was trained in the law and it does

not appear that it was represented by other counsel. Nowhere in the record was the council adequately abjured to an independence from its usual relationship to its solicitor. We recognize that our appellate courts would allow an attorney for an agency to "prosecute" a case for that body provided he gives no advice or makes no rulings in the particular case. We are satisfied, however, that the city solicitor transcended this role when in his opening remarks he stated, "It is my impression, as I have reviewed the record of this matter and discussed this matter with the witnesses who will testify on behalf of the bureau, that Officer Pickles did in fact violate certain rules and regulations promulgated by the Bureau of Police .... The recommendation from the bureau of Police is for the dismissal of Officer Richard Pickles and it is the expectation of counsel that the city council will confirm this dismissal." This emphatic and categorical expression of personal opinion by the solicitor on the sufficiency of the evidence under his construction of the relevant rules and regulations, the meaning of which was essential to council's adjudication, was a taint that came "perilously close" to violating due process.

## D.

To conclude this list of procedural infirmities we would add that city council violated the Sunshine Law by failing to vote on the officer's dismissal in a public meeting after notice to the public.[3] While the

---

3. Petitioner does not assert that meetings when council deliberated over his discharge should have been open to the public; only that meeting when the council voted to discharge him. Any claim that the former meetings should have been open would fail. See Mellin v. Allentown, 60 Pa. Commw. 114, 430 A.2d 1048 (1981).

council did not have to open its deliberations on the dismissal to the public, it did have to pass the resolution discharging the officer from the police force at an open, public meeting.

The "Sunshine Law", Act of July 19, 1974, P.L. 486, §1, et seq., 65 P.S. §261 (Purdon Supp. 1983-84),[4] "is the latest in a series of legislative enactments designed to provide a comprehensive format governing public access to the meetings and hearings of public agencies."[4] Judge v. Pocius, 28 Pa. Commw. 139, 142, 367 A.2d 788, 790 (1977).

Section 2 of the act provides that:

"The meetings on hearings of every agency at which formal action is scheduled or taken are public meetings and shall be open to the public at all times. No formal action shall be valid unless such formal action is taken during a public meeting. 65 P.S. §262.

The act defines "agency", in part, as "any political subdivision of the Commonwealth" and "formal action" as the "taking of any vote on any resolution, rule, order, motion . . . ." 65 P.S. §261. Thus, the vote discharging the officer was a formal action that had to be taken at a public meeting. Beisel v. Zerbe Township, 3 D.&C. 3d 355 (1977). Further, section 206 required that public notice be given of the meeting. Id. at §265.

In the instant case, no notice of the meeting was given and it was not public. The city clerk so testified at the hearing before us on November 3, 1983

---

4. The other laws are the "Open Meeting Law," Act of June 21, 1957, P.L. 392, as amended, 65 P.S. §251 et seq. (Purdon 1959), and the "Right to Know Act", Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §66.1 et seq. (Purdon Supp. 1983-84).

and her testimony was not refuted. City council thus completely failed to comply with the Sunshine Law and the vote to discharge petitioner was null and void. The Commonwealth Court's statement in voiding a resolution passed by the School District of Bensalem Township in violation of the Sunshine Law is apropos here:

"The Sunshine Law plays a vital role in opening the doors of government decision making to the public view. The law requires that formal action by agencies covered by the law be taken at public meetings. It also requires that public notice of such public meetings be given prior to the meetings. The law sets forth the manner in which public notice is to be given and it intends that it be given *in the manner specified.* See Judge v. Pocius, 28 Pa. Commw. 139, 145, 367 A.2d 788, 791 (1977); see also Attorney General Opinions no. 77-13 and no. 74-46. The district here did not commit a "technical" violation of Section 5 of the law. It did not comply with the law at all. The board's meeting of October 9, 1974 was conducted in violation of the law. The resolution passed by the board and at issue here is, accordingly, invalid." Bensalem Township School District v. Gigliotti Corporation, 51 Pa. Commw. 609, 615-16, 415 A.2d 123, 126 (1980) (Emphasis in original.)

The rationale of Bensalem Township applies with even greater force to the instant case. In Bensalem Township, the meeting was open to the public but no notice of it had ever been given to the public. Here, not only was no notice given but also the meeting was private. Because of this complete failure to abide by the Sunshine Law, city council's discharge of petitioner was null and void.

## II. THE SUBSTANCE

Since the consequence of holding that Richard L. Pickles was denied his right to a fair hearing would be a remand of the case for a new hearing, an action that would simply prolong this case to the additional inconvenience of Pickles, we will dispose of the matter on substantive grounds and it is manifestly just that we should do so.

In doing so we are mindful of the principle that a court should not lightly set aside an order of dismissal rendered at the hands of a duly-elected and constituted body of public officials who are charged with conducting the affairs of the police department. Ditko Appeal, supra. We cannot be less concerned, however, with a principle of equal force: that the assurance of a desired flexibility in administrative procedures does not go so far as to justify orders without a basis in evidence having rational probative force. Phillips, Applnt. v. Unemp. Comp. Bd., 152 Pa. Super. 75, 30 A.2 718 (1943).

### A.

The superficial quality of the adjudication is revealed in the manner in which council dealt with the charge under Article IV, section 4.05 of the Code of Conduct which complained that Pickles had failed "to comply with any Police Chief's or Director of Public Safety's orders, directives, regulations, etc., or any oral or written orders of superiors."

In its adjudication, council disposed of this charge as follows:

"City Council finds defendant violated this section, but notes that the city already administered the maximum discipline—5 days suspension—provided under the Code of Conduct for a first violation of this

section. Hence no further action is taken on this charge."

Like the charge itself, we can have no idea from this statement what council found that Pickles did to violate the section. According to Dean, whose advice on this matter was solicited by council, the section referred to any matter promulgated during his tenure pertaining to the conduct of members of his department:

"Mr. Moore: Under Section 4.05: Failure to comply with any Police Chief's or Public Safety Director's orders, directives, regulations, et cetera, or any oral or written order of supervisors.

When this charge refers to orders, directives, regulations, is it referring now just to the Public Safety Directives or other kinds of orders or directives other than those?

"Mr. Dean: The latter part, other kinds of orders other than specific directives: any written or oral communications, et cetera.

•  •  •

Mr. Moore: So would it be fair to say that what we are basically talking about are those things which earlier were identified to us as Public Safety Directives of various numbers?

Mr. Dean: In addition to other training manuals, et cetera, and any other written procedures which I may have developed, yes."

•  •  •

Ms. Perkins: Article 4, Section 4.05 . . . . exactly what does et cetera mean in the failure to comply with any Police Chief's or Director of Public Safety orders, directives, regulations, et cetera.

Was that the training manual?

Mr. Dean: Yes, or any other thing . . . . Et cetera means and so forth and so on. Any other policy, procedure that we develop that we have not clearly de-

lineated in our description of directives, orders, et cetera.

It is a term which is to be all inclusive.

The foregoing colloquy proves beyond argument that because of its vagueness and generality the members of council themselves did not understand the meaning of the charge that they were convened to decide; and their adjudication on it is every bit as obscure and, for that reason, invalid. "In a long line of cases it has been held that where an administrative agency, pursuant to a delegated power, promulgates an order, definitive, basic findings of fact are essential to the validity of its action, and such findings must be sufficiently specific to enable the court in reviewing that action to pass upon questions of law. . . . Where the findings fail to specify the alleged improprieties, they are insufficient findings and any conclusions of law based upon them are without proper foundation. D'Anjolell v. State Bd. of Funeral Dir. 3 Pa. Commw. 64, 280 A.2d 123 (1971)." It is certainly no comfort to Pickles that the penalty for this violation has already been suffered. "The courts and the litigants are entitled to clear, precise and unambiguous statements of positions from these quasi-judicial bodies. This is especially so where a citizen's professional pursuit is at stake." D'Anjolell, supra. p. 69.

Because of the foregoing disposition, we need not discuss at length the other fatal flaw in the bald conclusion that Pickles had violated §4.05.

Pickles denied that he had received or was familiar with all directives and other policy materials, particularly Directive no. 5 relating to the discharge of firearms by police personnel about which much testimony was offered; and the overwhelming evidence, which included Public Safety Director Dean's own admissions confirmed by the testimony

of other senior officers, was that the way in which policy materials were distributed, communicated and explained to the line officers prior to December 4, 1982 was so utterly haphazard and unreliable that the city did not and could not carry its burden of proving that Pickles ever knew or should have known that such a directive existed.

### B.

The city's finding that Pickles was in violation of Article V, Section 5.09 because of "improper use, handling or display of firearms" was founded upon council's misunderstanding of the plain meaning of the pertinent language and upon a capricious disregard of testimony. The charge, according to the adjudication, related to Section B of Public Safety Directive no. 5 (CX2) which provides as follows:

"B. A police officer is justified in using deadly force when he/she believes that such force is necessary to prevent death or serious bodily injury to himself or to another person."

The foregoing is simply a re-statement of the crimes code provisions on justification for the use of deadly force whether by a police officer in making an arrest or any other citizen in self defense. 18 Pa. C.S. §505. The significant element in the defense is the belief of the actor. It must be reasonable, of course, but it is subjective; according to the circumstances as the actor believes them to be when the force is used. The point is that city council ignored the issue of Pickles' belief and construed the provision as justification only if the circumstances, as ultimately revealed, disclosed that the threat was actual, not just perceived. Thus, the adjudication reads:

"Hence, Officer Pickles' justification of the use of deadly force depends on his satisfactory proof to council *of his need* to prevent death or serious bodily injury to himself or to another person." (Emphasis added.)

The plain language of the directive refutes this interpretation which council may well have derived from the testimony of Dean:

"Mr. Wagner: Assume for a second that once Officer Pickles came next to the car door in which Mr. Marks was engaged in attempting to start the engine, assume for a second that Mr. Marks had a weapon inside that car.

Is the police officer at that point when he sees the weapon permitted to use deadly force?

Mr. Dean: If he *knows* it is a weapon that might be used against him. If he *knows* it is a weapon. (Emphasis added.)

. Mr. Wagner: How would you know it is a weapon unless you would ask the occupant of the car if in fact it is a weapon?

Mr. Dean: That is why you have the policy. The policy says if you don't know, you don't use deadly force. . . .

Mr. Wagner: If he is at that point and the occupant of that car is in a position that the officer reasonably believes that the occupant has a weapon, is he permitted to protect himself?

Mr. Dean: He not only can reasonably believe, but he must know specific instances of information. . .

Mr. Wagner: How does he know that that is a weapon?

Mr. Dean: That is just the point, counselor. *If he doesn't know, then he doesn't use deadly force.*" (Emphasis added.)

This erroneous interpretation of the directive as requiring actual knowledge is implicit in the following statement in the adjudication: "In considering that issue, council reviewed the training generally provided to police officers relative to shooting decisions, noting the three criteria of (1) ability of the suspect to cause death or serious bodily injury, (2) opportunity of the suspect to cause such, and (3) whether the suspect takes action which places the officer or another person in jeopardy of such. Council determined that Marks had not placed defendant or others in jeopardy at the time defendant shot him." It is also noteworthy that on this charge, council placed the burden on Pickles to exonerate himself, a posture that Dean himself never asserted.

Almost gratuitously, council added in its adjudication that not only did Pickles fail to prove that he was in actual danger when he fired, but they rejected his explanation that he had fired in the belief that he was defending himself, an explanation the truth and reasonableness of which had not been disputed by any previous source; not the Firearms Review Board, not the Disciplinary Board, not the Internal Affairs Investigating Unit, not the Pennsylvania State Police, not, indeed, even Dean. There was never any suggestion in the city's presentation of proof that the testimony of Pickles was untrustworthy and as we have pointed out on page 9 of this opinion, any such argument was specifically renounced by the city solicitor at the hearing before us.

The reasons asserted by city council for disbelieving Pickles on this issue are so palpably contrived and insubstantial that they would scarcely merit comment if the accusation were not so prejudicial to the reputation of the officer. The reasons are both

factually inaccurate and a capricious disregard of testimony.

Council's explanation for this conclusion was brief; stating that Mowery, an officer at the scene, did not confirm Pickles' testimony of movements made toward him by the victim and that council did not see any similarity between a Mac-10 mini-machine pistol and the mirror found in the victim's car.

The first reason ignores the thrust of Mowery's testimony when considered in its entirety that he was some three or four feet from the car when the shot was fired and to the rear of Pickles' left shoulder. It was dark inside the vehicle, and although council members tried to persuade him that he could see clearly he described this as "some view into the car through the dashboard and door area." When the questions were put to him directly, he said that he couldn't really remember whether the victim had looked at Pickles, or turned his head or body toward Pickles.

The fact of the matter, as his other testimony reveals, is that Mowery could not see what Marks was doing at that moment. Pickles testified that Marks was still trying to start the car and he reached in and batted his arms up. As he did this, Marks' arms came down and in "one movement, he came up with the object and turned at the same time." It is cirtically important to recognize that Mowery corroborated Pickles' testimony of this moment, stating that he remembered Pickles reaching into the car in a batting motion but adding that he (Mowery) was moving to try to keep the suspect in view and couldn't actually see what Pickles was doing.

"Q. Officer Pickles' hand was in the car batting you assumed?

A. I didn't actually see, it was just like his elbow would have been right here on the car somewhere

. . . . and I'm moving around to keep a view of the subject . . . . I couldn't tell exactly what he was doing. . . ."

It was in this fraction of time that the shot was fired (a State Police analysis of Communications Center tapes calculated that the entire incident, from the time Pickles radioed that the suspect vehicle was stopped at State Street until the call was made for an ambulance for Marks, lasted only 27 seconds) and the incontrovertible evidentiary conclusion is that at this moment to which council made reference Pickles was standing between Mowery and Marks, reaching in and across in front of Marks, obstructing Mowery's view. Mowery didn't see Pickles' gun and only remembered seeing Pickles arch himself backward and a flash. He didn't even know who had fired the shot until he saw Pickles still standing.

This evidence was far short of the direct contradiction found by council.

The skepticism arising out of council's failure to see a similarity between a weapon and a mirror which council examined leisurely, in ample light, with full knowledge of the real nature of the objects being compared can only be viewed as a capricious disregard of the testimony of Harrisburg Police Officer Deppen who arrived at the scene moments after the shooting and shone his flashlight into the victim's car:

"A: I was expecting to see a gun and I was shocked when it was a mirror. But even, it took me awhile to tell that it was a mirror."

Q.: Did it take you awhile to tell that it was not a gun?

A.: Yes, yes. I didn't know what it was . . . ."

A.: When I did look at the object, I had to get down very close and bent down. I didn't go in the

car but I was within just a few inches, trying to make out what it was . . . .

A.: . . . I had looked down to see if he was armed and had a weapon . . . And when I seen what he had, I had to get down, like I said, I had to get down close and look . . . It took 'til I realized what it was, it was a few seconds that went by.

A.: At that instantaneous moment when you looked in, were you able to tell it was a mirror?

Q.: Oh, no."

Consider also the testimony of Samuel P. Strauser, Pennsylvania State Police, assigned to co-operate with the Harrisburg Police Department in a re-enactment of the occurrence under simulated conditions; 0200 a.m. at Front and State Street on December 6, 1982, on cross-examination by the city solicitor:

"Q.: Did somebody on the investigating crew ask them for their responses to what they saw?

A.: Trooper Kelly did.

Q.: Did any of them indicate what they thought they saw?

A.: Yes, sir.

Q.: What did they think they saw?

A.: I think it ranged from probably some of them thought it could have been an automatic weapon, some possibly didn't know what it was.

• • •

Q.: How many of them if you know would have said it looked like an automatic weapon.

• • •

A.: I was present when at least one of them said it.

• • •

Q.: What else did they say it might have looked like?

A.: Some didn't know. As I recall none of them said it was a rearview mirror as I recall.

. . .

Q.: What did it look like to you?

A.: . . . . I didn't know what it was.

A.: . . . . The item that impressed me the most is that item that sticks up in the air there, was sticking up. That could very well have been the bolt of an automatic weapon in my mind."

Capricious disregard of evidence is wilful and deliberate disregard of competent and relevant evidence, which one of ordinary intelligence could not have avoided in reaching a result. Hart v. Civil Service Com. of Phila. 73 Pa. Commw. 26, 457 A.2d 211 (1983). The evidence upon which council reached this conclusion, in the light of the testimony of officers trained in observation, weapons and appropriate reactions to emergency situations, is simply not such evidence that a reasonable mind would accept as adequate to support a conclusion that Pickles fired, not in self-defense, but, as must be implied by council's finding, without threat to himself he just reached in and fired a bullet into Marks' head.

In finding that Pickles had not acted in self-defense, council made no mention of Pickles' personal background of concern for human life and his responsible conduct as a police officer. As a high school student he had worked in hospitals and nursing homes; he is a licensed practical nurse and in the Army Medical Corp he became a field medic and was given charge of a MASH hospital. Described by a supervisor in the Harrisburg Police Department as "a bright young officer with a lot of initiative" he had been selected by a former chief as one of 15 officers throughout the Commonwealth chosen to assist the Pennsylvania State Police in a project to revamp the Municipal Police Training Course, and not long before the Marks incident, he was specially

accepted for the Harrisburg Police canine unit. The finding by council was never suggested by the prosecution itself and has no support in the evidence.

## C.

We have previously demonstrated that the charge that Officer Pickles had violated Article I, Section 1.12 of the Code of Conduct was invalid for lack of specificity, also noting that Dean and the Disciplinary Board (which exonerated Pickles on this charge) could not even agree on whether the charge related to "repeated violations of departmental rules and regulations" or some "other course of conduct indicating that a member has little or no regard for his/her responsibility as a member of the Bureau of Police."

Council apparently elected to go with Dean's version (although the record does not disclose that Pickles was ever advised of this), found Pickles guilty and ordered his dismissal. This finding was as substantively deficient as the charge was procedurally wanting.

In support of its finding, council alleged only a single improper act by Pickles, but in what may have been an effort to suggest a series of acts, simply stated it in two different ways; first, that Pickles failed to remain in his vehicle to await back-up assistance and, second, Pickles advanced on the suspect vehicle without waiting for back-up assistance. The consequence of this act which, according to council amounted to conduct unbecoming an officer, was that Pickles thereby exposed himself to possible harm. An interesting contradiction comes immediately to mind, of course, in that council measured Pickles' duty to protect the suspected felon by what was, but his duty to protect himself by

what might have been. More to the point, however, is that "course of conduct" is commonly understood (Webster 3rd Ed.) to mean more than one act (See Commonwealth v. Schnabel, 236 Pa. Super. 280, 344 A.2d 896 (1975)), and the use here in conjunction with "repeated violations" confirms this meaning, especially in the light of the fact that under the Code of Conduct dismissal could be the penalty for the first offense.

More importantly, the conclusion that what Pickles did at the scene was incorrect police procedure was not supported by the evidence. The circumstances of this police chase and apprehension are not such that common knowledge or experience of laymen is sufficient to form a basis for passing intelligent judgment and in such cases, expert testimony is an indispensable requirement to establish reasonableness of conduct. Collins v. Hand, 431 Pa. 378, 246 A.2d 398 (1968). There was no such testimony in the city's case. Dean could not give it because he admittedly did not know all the relevant facts and did not disclose all the facts that he did know upon which his opinions were founded. We have already discussed why his testimony was improperly admitted. Dean admitted that there was no departmental policy on the procedure applicable to these circumstances and that the instruction in this procedure was that which Pickles had received at Harrisburg Area Community College. According to Dean, Pickles "violated the training that he received at HAAC on how to handle a felony stop.

"Q.: You testified as to a procedure that Officer Pickles should have used and you referred to this as a felony stop procedure, is that right?

A.: Yes.

Q.: Do you have a Public Safety Directive issued regarding a felony car stop procedure?

A.: No, we don't . . . . we do not have a felony car stop directive at this point.

Q.: So any instructions that Pickles would have received regarding that type of procedure would have been from HAAC?

A.: Yes."

But when the city called Hopkins, the instructor at HAAC, he could not testify that Pickles was ever instructed in a felony car stop procedure for the situation he confronted on the morning of December 4, 1982. According to Hopkins, the students were instructed on a basic procedure of remaining with the police vehicle and ordering the suspect to get out. It is conceded that this is exactly what Pickles initially did. At this point he did what neither Spicer or Mowery did; remained with his vehicle.

Officer Mowery's testimony confirms that Pickles did not immediately exit his vehicle. Mowery stated that Pickles had stopped before he (Mowery) did at State Street. Yet Mowery had left his own vehicle, had moved up to the left front area of the suspect vehicle and then away from the vehicle before he saw Pickles near the suspect vehicle. This corroborates Pickles' testimony that after stopping, "As I was radioing, I could see Mowery's head out of his vehicle and could see him moving towards the vehicle." Pickles' was asked why he advanced on the suspect vehicle:

"Q. Wagner: Why did you take that action at that point?

A.: Well, I saw Mowery approaching him and I am not going to stay back there. Mowery had already made a move up towards the car and I didn't want to let him up there by himself."

Hopkins stated that the basic procedure governs when there is co-operation from the suspect but admitted that when the suspect refuses to comply with the order that this circumstance, along with others, introduces variables for which the trainees were simply "told to use their best judgment." There were, of course, many variables on December 4, 1982, including a stolen automobile, a high-speed chase involving great risk to the public and the pursuing officers; two prior flights by the suspect felon after being stopped; and most significantly, a fellow officer who was seen by Pickles in a position of danger in front of the suspect's vehicle. The only expert who testified on all the relevant facts was Matthew E. Hunt, a Lieutenant in the Pennsylvania State Police, an officer of vast experience and outstanding credentials, who stated that Officer Pickles' conduct in advancing on the suspect vehicle was, under the circumstances confronting him, entirely proper.

Q.: . . . do you have an opinion as to the propriety of the actions of Office Pickles on December 4, of 1982?

A.: Yes, sir. I have a very definite opinion.

Q.: What is that opinion, sir?

A.: My opinion is that Officer Pickles acted as he was trained to act and as he, more importantly, should have acted."

The testimony of Lieutenant Hunt (Volume 8, pages 8 through 238) is an interlude of cogency, candor and objectivity in a record not consistently of this quality.

The council had no license to reject this testimony. Mere disbelief of a witness or other competent evidence does not satisfy the standard of capricious disregard, but to ignore the testimony of Hunt in the light of Hopkins' description of the course of training which Dean himself established as the profes-

sional standard by which Pickles' conduct was to be measured, can only be so characterized. It was such deliberate disbelief of the undoubted evidence from an apparently trustworthy source as would be repugnant to a person of reasonable intelligence. Kuchinski v. Workmen's Compensation Appeal Board, 38 Pa. Commw. 210, 212, 392 A.2d 348, 349 (1978).

The fact that stands out in council's brief discussion of the reasons why this police officer's conduct was so unbecoming as to deserve the severe penalty of dismissal, almost certainly tantmount to the end of a career, was the focus on his single act unrelated in the discussion to the conduct of the victim.

What of the shocking disregard the victim had already displayed for his own life, and for the lives of the pursuing officers and other citizens on the streets of Harrisburg? Pickles was attempting to take into custody a suspect who had engaged in a wild, high-speed chase in a stolen car, in the dark of early morning, with lights out, at speeds up to 80 miles per hour through traffic lights at two of the busiest intersections on Front Street; who had, in the course of the chase, twice fled away in his vehicle after stops by a uniformed police officer in a marked patrol car and who after his vehicle was stopped in downtown Harrisburg, ignored the commands from police officers, one of whom was Pickles, that he was under arrest and continued to try to operate his vehicle with the apparent intent of again fleeing the scene.

When he decided to approach the suspect's vehicle, Pickles did exactly what Officer Spicer had done in the two previous stops and what Officer Mowery, Pickles' companion officer at the scene, was also doing at that very moment. Indeed, the testimony of Pickles' instructor at HAAC, describing

his own conduct at felony stops in which he was involved indicates that it was what he had done.

Our duty here, according to the late Justice Horace Stern, one of our Commonwealth's most eminent jurists, is to determine whether the findings of city council are supported by the substantial and credible evidence (our duty under the Third Class City Code to hear the case de novo surely cannot mean less) and whether the conclusions deduced therefrom are reasonable and not capricious. All orders and decrees of legal tribunals, including those of administrative bodies, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. Pa. Labor Relations Bd. v. Kauffman Department Stores, 345 Pa. 398, 400, 29 A.2d 90, 92 (1942). Substantial evidence is more than a scintilla, and must do more than create a suspicion of the facts to be established. Suspicion may have its place but it cannot be substituted for evidence. Union Trust Co. of Pittsburgh's Petition, 342 Pa. 456, 464, 20 A.2d 779, 782 (1941).

The evidence in this case falls far short of the burden on the city to present substantial, clear and convincing evidence to support the charges against Pickles and to establish further that such charges proved were sufficient to warrant the severe penalty of dismissal: Soergel v. Bd. of Supervisors of Middlesex Township, 12 Pa. Commw. 311, 316 A.2d 89 (1974); CF. Schauer Dismissal Case, 401 Pa. 486, 165 A.2d 26 (1960).

We acknowledge the principle that a court should not change an adjudication of an administrative body because it would have done it differently or because it disagrees with the philosophical approach

of that body, but a reviewing court should over-turn an adjudication where it has violated a citizen's rights, abused its discretion or committed an error of law. N. American Coal Corp. v. Commonwealth, 2 Pa. Commw. 469, 480, 279 A.2d 356 (1971). In the Pickles' case, city council has done all of those things.

One thing more remains to be said.

An issue of race was introduced not as part of the city's proof but by members of council when they examined Pickles. The case, however, comprising almost 2,000 pages, established only a single fact relating to race in the events of December 4, 1982: that Officer Pickles is white and that Marks was black. That fact raises no inference of conflict in this court.

The examination of Pickles by members of council reads as follows:

"Q. Mr. Moore: Did you notice whether he was black or white?

A. I wasn't paying attention to the color of the skin or anything, I was arresting a felon.

Q. Gilchrist: Did he (the Dispatcher) describe the two in the car?

A. Just that there were two in the car.

Q. Did he say two Negro males?

A. I believe he did, I'm not sure.

• • •

Q. You were close enough to bat or to push the suspect's hands up, and yet you could not determine his race?

A. I wasn't concerned with his race at that time.

Q. Gohl: Have you ever been involved or have you ever been aware of any complaints that have come up against you, complaint that you as a white officer have abused or mistreated an individual because of their race . . . . ?

A. Nothing that, you know, pertained to anything.

. . .

Q. When you stop somebody for a traffic stop do you approach them differently because it's a white man or black man or a white woman or black woman?

A. No.

. . .

Q. In November of '80 there was a controversy involving some of the other members of the City Police Department involving some of their activities or their alleged activities, buying, selling medallions of the Ku Klux Klan. Were you involved in that?

A. No. No.

### ORDER

And now, May 9, 1984, the charges against Officer Richard L. Pickles set forth in a letter from Harrisburg City Council dated March 17, 1983, upon which city council rendered an adjudication under date of June 24, 1983, are hereby dismissed.